# Exhibit A

 **CT Corporation**

**Service of Process Transmittal**
04/03/2017
CT Log Number 530971681

| | |
|---|---|
| **TO:** | John Verscaj, Private Litigation Counsel<br>Kraft Heinz Foods Company<br>218 Exmoor Ave.<br>Glen Ellyn, IL 60137 |

**RE:** **Process Served in Virginia**

**FOR:** Mondelez International Inc. (Domestic State: VA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | VALORIE WINN, on behalf of herself and all others similarly situated, Pltf. vs. MONDELEZ INTERNATIONAL, INC. and PAK 'N SAVE, INC., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Attachment(s), Notice, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Superior Court of California, Alameda, CA<br>Case # RG17854671 |
| **NATURE OF ACTION:** | Product Liability Litigation - Manufacturing Defect - Partially hydrogenated oil |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Glen Allen, VA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 04/03/2017 at 09:45 |
| **JURISDICTION SERVED :** | Virginia |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Gregory S. Weston<br>The Weston Firm<br>1405 Morena Blvd<br>Suite 201<br>San Diego, CA 92110<br>619) 798-2006 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/03/2017, Expected Purge Date: 04/08/2017<br><br>Image SOP<br><br>Email Notification,  John Verscaj  john.verscaj@verscajlaw.com<br><br>Email Notification,  Ellen Smith  ellen.smith@mdlz.com<br><br>Email Notification,  Kevin Brennan  Kevin.Brennan@mdlz.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 4701 Cox Road<br>Suite 285<br>Glen Allen, VA 23060 |
| **TELEPHONE:** | 804-217-7255 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Mondelez International, Inc. and Pak 'N Save, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Valorie Winn

ENDORSED
FILED
ALAMEDA COUNTY

MAR 2 8 2017

CLERK OF THE SUPERIOR COURT
By MICHELLE BANKS
                              Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California, Alameda

Rene C. Davidson Courthouse,
1125 Fallon St., Oakland, CA 94612

**CASE NUMBER:**
*(Número del Caso):* RG17854671

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gregory S. Weston, The Weston Firm, 1405 Morena Blvd., Suite 201, San Diego, CA 92110/ (619) 798-2006

DATE: MAR 2 8 2017          Clerk, by **MICHELLE BANKS**          , Deputy
*(Fecha)*                   *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [✓] as an individual defendant.
2. [  ] as the person sued under the fictitious name of *(specify):*

3. [  ] on behalf of *(specify):*

   under: [  ] CCP 416.10 (corporation)          [  ] CCP 416.60 (minor)
          [  ] CCP 416.20 (defunct corporation)  [  ] CCP 416.70 (conservatee)
          [  ] CCP 416.40 (association or partnership) [  ] CCP 416.90 (authorized person)
          [  ] other *(specify):*
4. [  ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Gregory S. Weston (239944)<br>The Weston Firm<br>1405 Morena Blvd., Suite 201<br>San Diego, CA 92110<br>TELEPHONE NO.: (619) 798-2006   FAX NO.: (313) 293-7071<br>ATTORNEY FOR *(Name):* | ENDORSED<br>FILED<br>ALAMEDA COUNTY<br><br>MAR 2 8 2017<br><br>CLERK OF THE SUPERIOR COURT<br>By ___ LLE BANKS ___ Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Alameda
STREET ADDRESS: 1125 Fallon St.
MAILING ADDRESS: 1125 Fallon St.
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
Winn v. Mondelez International, Inc. and Pak 'N Save, Inc.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: RG17854671 |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>*(Cal. Rules of Court, rule 3.402)* | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☑ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation**
*(Cal. Rules of Court, rules 3.400–3.403)*
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):*  Nine
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 3/24/2017
Andrew C. Hamilton
_____
(TYPE OR PRINT NAME)            ►  _____  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

```
┌                              ┐   ┌                              ┐
  The Weston Firm                    Mondelez International, Inc.
  Attn: Weston, Gregory S
  1405 Morena Blvd.
  Suite 201
└ San Diego, CA   92110___     ┘   └                              ┘
```

## Superior Court of California, County of Alameda
## Rene C. Davidson Alameda County Courthouse

| | |
|---|---|
| Winn | No. <u>RG17854671</u> |
| Plaintiff/Petitioner(s) | |
| VS. | |
| Mondelez International, Inc. | NOTICE OF HEARING |
| Defendant/Respondent(s) | |
| (Abbreviated Title) | |

To each party or to the attorney(s) of record for each party herein:

Notice is hereby given that the above-entitled action has been set for:

Complex Determination Hearing
Case Management Conference

You are hereby notified to appear at the following Court location on the date and time noted below:

Complex Determination Hearing:
DATE: 05/16/2017    TIME: 03:00 PM    DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
          201 13th Street, Oakland

Case Management Conference:
DATE: 07/11/2017    TIME: 03:00 PM    DEPARTMENT: 30
LOCATION: U.S. Post Office Building, Second Floor
          201 13th Street, Oakland

Pursuant to California Rules of Court, Rule 3.400 et seq. and Local Rule 3.250 (Unified Rules of the Superior Court, County of Alameda), the above-entitled matter is set for a Complex Litigation Determination Hearing and Initial Complex Case Management Conference.

Department 30 issues tentative rulings on DomainWeb (www.alameda.courts.ca.gov/domainweb). For parties lacking access to DomainWeb, the tentative ruling must be obtained from the clerk at (510) 268-5104. Please consult Rule 3.30(c) of the Unified Rules of the Superior Court, County of Alameda, concerning the tentative ruling procedures for Department 30.

Counsel or party requesting complex litigation designation is ordered to serve a copy of this notice on all parties omitted from this notice or brought into the action after this notice was mailed.

All counsel of record and any unrepresented parties are ordered to attend this Initial Complex Case Management Conference unless otherwise notified by the Court.

Failure to appear, comply with local rules or provide a Case Management Conference statement may result in sanctions. Case Management Statements may be filed by E-Delivery, by submitting directly to the E-Delivery Fax Number (510) 267-5732. No fee is charged for this service. For further information, go to **Direct Calendar Departments at**

http://apps.alameda.courts.ca.gov/domainweb.

All motions in this matter to be heard prior to Complex Litigation Determination Hearing must be scheduled for hearing in Department 30.

If the information contained in this notice requires change or clarification, please contact the courtroom clerk for Department 30 by e-mail at Dept.30@alameda.courts.ca.gov or by phone at (510) 268-5104.

TELEPHONIC COURT APPEARANCES at Case Management Conferences may be available by contacting CourtCall, an independent vendor, at least 3 business days prior to the scheduled conference. Parties can make arrangements by calling (888) 882-6878, or faxing a service request form to (888) 883-2946. This service is subject to charges by the vendor.

Dated:  03/29/2017                Chad Finke  Executive Officer / Clerk of the Superior Court

                                  By    *P. Ngumu*
                                                          Deputy Clerk

---

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 03/30/2017.

                                  By    *P. Ngumu*
                                                          Deputy Clerk

1 | **THE WESTON FIRM**
GREGORY S. WESTON (239944)
2 | *greg@westonfirm.com*
ANDREW C. HAMILTON (299877)
3 | *andrew@westonfirm.com*
1405 Morena Blvd., Suite 201
4 | San Diego, CA 92110
Telephone:    (619) 798-2006
5 | Facsimile:     (313) 293-7071
6 |
*Counsel for Plaintiff*
7 |

ENDORSED
FILED
ALAMEDA COUNTY

MAR 2 8 2017

CLERK OF THE SUPERIOR COURT
By ___MICHELLE BANKS___
Deputy

8

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9

FOR THE COUNTY OF ALAMEDA

10

11

12 | Case No: ___RG17854671___

13 | VALORIE WINN, on behalf of herself and
all others similarly situated,

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

14 |

CAL. BUS. & PROF. CODE §§17200 *et seq.*;

15 | Plaintiff,

CAL. BUS. & PROF. CODE §§17500 *et seq.*;

16 | v.

CAL. CIV. CODE §§ 1750 *et seq.*; and

17 | MONDELEZ INTERNATIONAL, INC. and
PAK 'N SAVE, INC.

**BREACH OF EXPRESS AND IMPLIED WARRANTIES**

18 |

**DEMAND FOR JURY TRIAL**

19 | Defendants.

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

### TABLE OF CONTENTS

I.       JURISDICTION AND VENUE .................................................................................. 1

II.      NATURE OF THE ACTION ..................................................................................... 1

III.     PARTIES .................................................................................................................... 2

IV.      NATURE OF TRANS FAT....................................................................................... 2

         A.      There is a Scientific Consensus That Trans Fat is Extremely Harmful ............ 4

         B.      The Artificial Trans Fat in Ginger Snaps Causes Cardiovascular Disease......... 5

         C.      The Artificial Trans Fat in Ginger Snaps Causes Type-2 Diabetes.................... 8

         D.      The Artificial Trans Fat in Ginger Snaps Causes Breast, Prostate, and Colorectal
                 Cancer .............................................................................................................. 8

         E.      The Artificial Trans Fat in Ginger Snaps Causes Alzheimer's Disease and
                 Cognitive Decline ............................................................................................ 9

         F.      The Artificial Trans Fat in Ginger Snaps Causes Organ Damage ..................... 10

V.       PLAINTIFF'S PURCHASES OF GINGER SNAPS ................................................ 12

VI.      SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE
         ACTS ........................................................................................................................ 13

VII.     GINGER SNAPS UNNECESSARILY CONTAINED PHO AND ARTIFICIAL TRANS
         FAT ........................................................................................................................... 16

VIII.    DEFENDANTS' PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE
         CALIFORNIA UNFAIR COMPETITION LAW ...................................................... 17

IX.      DEFENDANTS' PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING OF
         THE CALIFORNIA UNFAIR COMPETITION LAW .............................................. 17

X.       RELIANCE AND INJURY ....................................................................................... 18

XI.      DELAYED DISCOVERY ......................................................................................... 19

XII.     CLASS ACTION ALLEGATIONS ........................................................................... 20

XIII.    CAUSES OF ACTION .............................................................................................. 24

XIV.     PRAYER FOR RELIEF ............................................................................................ 33

XV.      JURY DEMAND ....................................................................................................... 34

XVI.     DISCLAIMER OF FEDERAL JURISDICTION ....................................................... 34

i

Plaintiff Valorie Winn, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Defendants Mondelez International, Inc. ("Mondelez") and Pak 'N Save, Inc. (Pak 'N Save) (collectively "Defendants") and, upon information and belief and investigation of counsel, alleges as follows:

## I.   JURISDICTION AND VENUE

1.      Jurisdiction is proper in the Superior Court of Alameda because Plaintiff is a citizen of California and because all claims are asserted under the laws of California.

2.      Venue is proper in the Superior Court for the County of Alameda because the cause of action accrued in Alameda County, Plaintiff is a resident of Alameda County, and one defendant's principal places of business is in Alameda County.

## II.   NATURE OF THE ACTION

3.      Mondelez manufactures, markets, distributes and sells Ginger Snaps, a cookie product that contained partially hydrogenated oil ("PHO") until as recently as December 28, 2014.

4.      PHO is a food additive banned in the United States and many parts of the world due to its artificial trans fat content.

5.      Artificial trans fat is a toxin and carcinogen for which there are many safe and commercially viable substitutes.

6.      Mondelez used various marketing methods to falsely represent Ginger Snaps as healthful, made with traditional natural ingredients, and not harmful to the cardiovascular system.

7.       Contrary to these claims, Ginger Snaps contained dangerous levels of PHO, and thus trans fat.

8.      Pak 'N Save sells Ginger Snaps and other prohibited, adulterated foods to California citizens, including to Plaintiff.

9.      On June 17, 2015, the FDA determined that PHO is unsafe for use in food. *See* 80 Fed. Reg. 34650 (June 17, 2015) (hereinafter "FDA Final PHO Determination"). Although safe, low-cost, and commercially acceptable alternatives to PHO have always been available, with many companies switching in the early 1990's, Mondelez unfairly elected *not* to use these safe alternatives in Ginger Snaps in order to increase profit at the expense of the health of consumers.

1

10.     Additionally, Mondelez misleadingly markets Ginger Snaps with health claims. This false advertising deceives consumers into purchasing a product that is harmful to their health.

11.     Plaintiff Valorie Winn repeatedly purchased and consumed Ginger Snaps manufactured by Mondelez during the Class Period defined herein, including from Defendant Pak 'N Save, a retail grocery store that sells Ginger Snaps.

12.     This action is brought to remedy Mondelez's unfair, deceptive, immoral, and unlawful conduct. On behalf of the class defined herein, Plaintiff seeks an order compelling Mondelez to, *inter alia*: (1) cease marketing and selling Ginger Snaps using the false, misleading, deceptive, and unconscionable tactics complained of herein; (2) conduct a corrective advertising campaign; (3) destroy all misleading and deceptive materials and products; (4) award Plaintiff and the Class members restitution, actual damages, and punitive damages to the extent permitted under the law; and (6) pay costs, expenses, and reasonable attorneys' fees. Plaintiff further seeks an order requiring Pak 'N Save to cease selling products with PHO and pay restitution to buyers of Ginger Snaps.

### III.     PARTIES

13.     Defendant Mondelez International, Inc. is a Virginia corporation with its principal place of business in Deerfield, Illinois. Mondelez International, Inc. owns, manufactures, and sells Ginger Snaps.

14.     Defendant Pak 'N Save, Inc. is a California corporation with its principal place of business in Pleasanton, California. Pak 'N Save sells Ginger Snaps to the public.

15.     Plaintiff Valorie Winn is a resident of Alameda County, California who repeatedly purchased Ginger Snaps for personal and household consumption.

### IV.     NATURE OF TRANS FAT

16.     Artificial trans fat is a toxic, unlawful food additive manufactured via an industrial process called partial hydrogenation, in which hydrogen atoms are added to normal vegetable oil by heating the oil to temperatures above 400°F in the presence of ion donor catalyst metals such as

2

1   rhodium, ruthenium, and nickel.[1] The resulting product is known as partially hydrogenated oil, or PHO,

2   and it was used in dangerous quantities in Ginger Snaps.

3       17.   PHO was invented in 1901 and patented in 1902 by German chemist Wilhelm Normann.

4   Artificial trans fat molecules differ chemically from the natural fat molecules in other food products.[2]

5       18.   Natural fat, except the trace amounts of natural trans fat from ruminant animal sources

6   like beef, milk, and mutton, comes in two varieties: (1) fats that lack carbon double bonds ("saturated

7   fat") and (2) fats that have carbon double bonds with contiguous hydrogen atoms ("cis fat"). Trans fat,

8   in contrast to cis fat, has carbon double bonds with hydrogen atoms on opposite sides of the carbon

9   chain.



14      19.   PHO is attractive to the processed food industry because it combines the very low cost

15  of unsaturated cis fat with the "mouth feel" and long shelf life of saturated fat. Like processed cis fat,

16  PHO is manufactured from low-cost oil seeds,[3] while the saturated fat it replaces in processed food is

17  derived from relatively expensive animal and tropical plant sources.[4] Given its versatility, ten years ago

18  PHO was used in 40% of processed packaged foods.[5] Now that its toxic properties are known, few food

19  companies continue to use PHO. Mondelez, however, has decided not to follow its more responsible

[1]  *See* Alice H. Lichtenstein, *Trans Fatty Acids, Plasma Lipid Levels, and Risk of Developing Cardiovascular Disease*, 95 CIRCULATION 2588, 2588-90 (1997).

[2]  *See* Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999). *See also* Walter Willett, *The Scientific Case for Banning Trans Fats*, Scientific American, *available at* www.scientificamerican.com/article/the-scientific-case-for-banning-trans-fats/ (last visited January 24, 2017).

[3]  e.g., corn oil, soybean oil, cottonseed oil

[4]  e.g., butter, cream, palm oil, coconut oil

[5]  Mary Carmichael, *The Skinny on Bad Fat*, Newsweek, Dec. 1, 2003, at 66. *See also* Kim Severson, *Hidden Killer. It's Trans Fat. It's Dangerous. And It's In Food You Eat Every Day*, S.F. CHRON., Jan. 30, 2002.

3

1  peers and cease using PHO during the Class Period, instead unfairly placing its profits over public

2  health.

**A.      There is a Scientific Consensus That Trans Fat is Extremely Harmful**

4       20.     PHO causes cardiovascular heart disease, diabetes, cancer, and Alzheimer's disease, and

5  accelerates memory damage and cognitive decline.

6       21.     There is "no safe level" of PHO or artificial trans fat intake. [6]

7       22.     In addition, "trans fatty acids are not essential and provide no known benefit to human

8  health."[7] Thus, while "the [Institute of Medicine] sets tolerable upper intake levels (UL) for the highest

9  level of daily nutrient intake that is likely to pose no risk of adverse health effects to almost all

10  individuals in the general population[,] . . . the IOM does **not** set a UL for trans fatty acid because **any**

11  incremental increase in trans fatty acid intake increases the risk of CHD."[8].

12       23.     Dr. Julie Louise Gerberding, who served for both of President Bush's two terms as head

13  of the United States Centers for Disease Control and Prevention, summarized the issues:

14              The scientific rationale for eliminating exposure to artificial trans fatty acids in foods

15              is rock solid. There is no evidence that they provide any health benefit, and they are

16              certainly harmful. These compounds adversely affect both low- and high-density

17              lipoprotein cholesterol levels and increase the risk for coronary heart disease, even at

18              relatively low levels of dietary intake. Gram for gram, trans fats are far more potent

19              than saturated fats in increasing the risk for heart disease, perhaps because they also

20              have pro-inflammatory properties and other adverse effects on vascular

21              endothelium . . . Eliminating exposure to these dangerous fats could have a powerful

22              population impact—potentially protecting 30,000 to 100,000 Americans from death

---

[6] Food & Nutrition Bd., Inst. of Med., *Dietary Reference Intakes For Energy, Carbohydrate, Fiber, Fat, Fatty Acids, Cholesterol, Protein, and Amino Acids* (2005).

[7] Food Labeling; Health Claim; Phytosterols and Risk of Coronary Heart Disease, Proposed Rule, 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[8] *Id.* (emphasis added).

4

1  related to heart disease each year.[9]

2  24.   Dr. Mozaffarian of Harvard Medical School writes in the New England Journal of

3  Medicine:

4     Given the adverse effects of trans fatty acids on serum lipid levels, systemic

5     inflammation, and possibly other risk factors for cardiovascular disease and the

6     positive associations with the risk of CHD, sudden death from cardiac causes, and

7     possibly diabetes, the potential for harm is clear. The evidence and the magnitude of

8     adverse health effects of trans fatty acids are in fact far stronger on average than

9     those of food contaminants or pesticide residues, which have in some cases received

10    considerable attention.[10]

11  25.   Given its nature as an artificial chemical not naturally found in any food and the

12  considerable harm that it causes to human health, Dr. Walter Willett, also at Harvard Medical School,

13  finds the most direct analogue of trans fat to be not any natural fat but contaminants such as pesticides.

14  He states that the addition of artificial trans fat to food by companies like Mondelez "is a food safety

15  issue . . . this is actually contamination."[11]

16  **B.   The Artificial Trans Fat in Ginger Snaps Causes Cardiovascular Disease**

17  26.   Trans fat raises the risk of CHD more than any other known consumed substance.[12]

18  27.   Removing trans fat equivalent to 2% of total calories from the American diet "would

19  prevent approximately 30,000 premature coronary deaths per year, and epidemiologic evidence

20  suggests this number is closer to 100,000 premature deaths annually."[13]

21  28.   By raising LDL levels and lowering HDL levels, trans fat causes a wide variety of

22
23  [9] Julie Louise Gerberding, *Safer Fats for Healthier Hearts: The Case for Eliminating Dietary Artificial Trans Fat Intake*, 151 ANN. INTERN. MED. 137-38 (2009)

24  [10] Dariush Mozaffarian et al., *Trans Fatty Acids and Cardiovascular Disease*, 354 N. ENG. J. MED. 1601-13 (2006).

25  [11] Rebecca Coombes, *Trans fats: chasing a global ban*, 343 BRITISH MED. J. d5567 (2011).

26  [12] Mozaffarian, 354 NEW ENG. J. MED. at 1603.

27  [13] Alberto Ascherio et al., *Trans Fatty Acids & Coronary Heart Disease*, 340 NEW ENG. J. MED. 94, 94-8 (1999).

28

dangerous heart conditions, including vasodilation, coronary artery disease, and primary cardiac arrest.

29.    In a joint Dietary Guidelines Advisory Committee Report, the Department of Health and Human Services and the U.S. Department of Agriculture recognized "[t]he relationship between trans fatty acid intake and LDL cholesterol is direct and progressive, increasing the risk of cardiovascular disease."[14]

30.    The American Heart Association warns, "trans fats raise your bad (LDL) cholesterol levels and lower your good (HDL) cholesterol levels. Eating trans fats increases your risk of developing heart disease."[15]

31.    After a review of literature on the connection between the consumption of artificial trans fat and coronary heart disease, the FDA concluded:

> [B]ased on the consistent results across a number of the most persuasive types of
> study designs (i.e., intervention trials and prospective cohort studies) that were
> conducted using a range of test conditions and across different geographical regions
> and populations . . . the available evidence for an adverse relationship between trans
> fat intake and CHD risk is strong.[16]

32.    The FDA further found "[t]o date, there have been no reports issued by authoritative sources that provide a level of trans fat in the diet . . . below which there is no risk of [Coronary Heart Disease]."[17] Rather, there "is a positive linear trend between trans fatty acid intake and LDL cholesterol concentration, and therefore there is a positive relationship between trans fatty acid intake and the risk of CHD."[18]

33.    This evidence of trans fat's horrific impact on the health of Americans is more than 20

---

[14] Dep't of Health & Human Serv. & U.S. Dep't of Agric., 2005 Dietary Guidelines Advisory Committee Report, Section 10 (2005).

[15] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited January 12, 2017).

[16] Ctr. for Food Safety & Applied Nutrition, U.S. Food & Drug Admin., Questions & Answers About *Trans* Fat Nutrition Labeling.

[17] 75 Fed. Reg. 76526, 76542 (Dec. 8, 2010).

[18] *Id.*

6

1  years old. Dr. Walter Willett of Harvard Medical School found in 1994:

2  　　　　[E]ven the lower estimates from the effects [of PHO] on blood lipids would suggest

3  　　　　that more than 30,000 deaths per year may be due to the consumption of partially

4  　　　　hydrogenated vegetable fat. Furthermore, the number of attributable cases of

5  　　　　nonfatal coronary heart disease will be even larger.[19]

6  　　　　34.　　By taking blood samples from 179 survivors of cardiac arrest and 285 randomly-selected

7  control patients and comparing the top fifth with the bottom fifth of participants by trans fat intake,

8  another study published in the American Heart Association's *Circulation* found that the largest

9  consumers of trans fat have three times the risk of suffering primary cardiac arrest, even after

10  controlling for a variety of medical and lifestyle risk factors.[20]

11  　　　　35.　　Australian researchers observed that heart attack patients possess elevated amounts of

12  trans fat in their adipose tissue compared to controls, strongly linking heart disease with long-term

13  consumption of trans fat.[21]

14  　　　　36.　　While cholesterol dysregulation and pro-inflammatory effects are the best-documented

15  pathways through which trans fat causes heart disease and death, another study isolated an additional

16  method by which trans fat causes atherosclerosis, namely by degrading the function of TGF-β, a protein

17  responsible for preventing the development of atherosclerotic lesions.[22]

18  　　　　37.　　TGF-β also functions to suppress cancerous tumors. The same scientists suggest that the

19  degradation of TGF-β may be the reason that trans fat consumption is strongly linked to multiple forms

20  of cancer.[23]

21

22  [19] W.C. Willett et al., *Trans Fatty Acids: Are the Effects only Marginal?* 84 AM. J. PUB. HEALTH 722, 723 (1994).

23  [20] Rozenn N. Lemaitre et al., *Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest*, 105 CIRCULATION 697, 697-701 (2002).

24  

25  [21] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction.* 134 J. NUTR. 874, 874-79 (2004).

26  [22] Chen, C.L. et al., *A mechanism by which dietary trans fats cause atherosclerosis*, J. NUTR. BIOCHEMISTRY 22(7) 649-655 (2011).

27  [23] *Id.*

28

C.    **The Artificial Trans Fat in Ginger Snaps Causes Type-2 Diabetes**

38.    Artificial trans fat also causes type-2 diabetes.[24]

39.    In particular, trans fat disrupts the body's glucose and insulin regulation system by incorporating itself into cell membranes, causing the insulin receptors on cell walls to malfunction, and in turn elevating blood glucose levels and stimulating further release of insulin.

40.    Researchers at Northwestern University's medical school found that mice show multiple markers of type-2 diabetes after eating a high trans fat diet for only four weeks.[25]

41.    By the eighth week of the study, mice fed the diet high in trans fat showed a 500% increase compared to the control group in hepatic interleukin-1β gene expression, one such marker of diabetes, indicating the extreme stress even short-term exposure to artificial trans fat places on the body.[26]

42.    A 14-year study of 84,204 women found that for every 2 percent increase in energy intake from artificial trans fat, the relative risk of type-2 diabetes was increased by 39 percent.[27]

D.    **The Artificial Trans Fat in Ginger Snaps Causes Breast, Prostate, and Colorectal Cancer**

43.    Trans fat is a carcinogen which causes breast, prostate, and colorectal cancer.

44.    A 13-year study of 19,934 French women showed 75 percent more women contracted breast cancer in the highest quintile of trans fat consumption than did those in the lowest.[28]

45.    In a 25-year study of 14,916 American physicians, those in the highest quintile of trans fat consumption had more than double the risk of developing prostate cancer than the doctors in the

---

[24] Am. Heart Ass'n., *Trans Fat Overview*, *available at* tinyurl.com/TransFatOverview (last visited January 12, 2017).

[25] Sean W. P. Koppe et al., *Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet*, 297 AM. J. PHYSIOL. GASTROINTEST LIVER PHYSIOL. 378 (2009).

[26] *Id.*

[27] Jorge Salmeron et al., *Dietary Fat Intake and Risk of Type 2 Diabetes in Women*, 73 AM. J. CLINICAL NUTRITION 1019, 1023 (2001).

[28] Véronique Chajès et al., *Association between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study.* 167 AM. J. EPIDEMIOLOGY 1312, 1316 (2008).

8

lowest quintile.[29]

46.    A study of 1,012 American males observing trans fat intake and the risk of prostate cancer found "[c]ompared with the lowest quartile of total trans-fatty acid consumption, the higher quartiles gave odds ratios (ORs) equal to 1.58," meaning those in the highest quartile are 58% more likely to contract prostate cancer than those in the lowest.[30]

47.    A 600-person study found an 86 percent greater risk of colorectal cancer in the highest trans fat consumption quartile.[31]

48.    A 2,910-person study found "trans-monounsaturated fatty acids . . . were dose-dependently associated with colorectal cancer risk," which showed "the importance of type of fat in the etiology and prevention of colorectal cancer."[32]

**E.    The Artificial Trans Fat in Ginger Snaps Causes Alzheimer's Disease and Cognitive Decline**

49.    Trans fat causes Alzheimer's disease and cognitive decline.

50.    In a study examining 815 Chicago area seniors, researchers found "increased risk of incident Alzheimer disease among persons with high intakes of . . . trans-unsaturated fats."[33]

51.    The study "observed a strong increased risk of Alzheimer disease with consumption of trans-unsaturated fat."[34]

52.    In a study of 1,486 women with type-2 diabetes, researchers found "[h]igher intakes of .

---

[29] Jorge Chavarro et al., *A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer.*, 47 PROC. AM. ASSOC. CANCER RESEARCH 95, 99 (2006).

[30] Xin Liu et al., *Trans-Fatty Acid Intake and Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant*, 28 CARCINOGENESIS 1232, 1232 (2007).

[31] L.C. Vinikoor et al., *Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas*, 168 AM. J. EPIDEMIOLOGY 289, 294 (2008).

[32] Evropi Theodoratou et al., *Dietary Fatty Acids and Colorectal Cancer: A Case-Control Study*, 166 AM. J. EPIDEMIOLOGY 181 (2007).

[33] Martha Clare Morris et al., *Dietary Fats and the Risk of Incident Alzheimer Disease*, 60 ARCH. NEUROL. 194, 198-99 (2003).

[34] *Id.*

9

1 . . trans fat since midlife . . . were [] highly associated with worse cognitive decline . . . ."[35]

2     53.    The study cautioned "[d]ietary fat intake can alter glucose and lipid metabolism and is

3 related to cardiovascular disease risk in individuals with type 2 diabetes. Because insulin, cholesterol,

4 and vascular disease all appear to play important roles in brain aging and cognitive impairments,

5 dietary fat modification may be a particularly effective strategy for preventing cognitive decline,

6 especially in individuals with diabetes."[36] (citations omitted).

7     54.    Artificial trans fat also damages the brains of those who consume it. A study conducted

8 by UCSD School of Medicine of 1,018 men, mostly younger men, found trans fat consumption to be

9 strongly correlated with impaired memory.[37] The authors of the study, appearing in *Circulation*, the

10 American Heart Association's peer-reviewed journal, conclude that "Greater dTFA [dietary trans fatty

11 acid] was significantly associated with worse word memory in adults aged 20-45 years, often critical

12 years for career building."

13     55.    Performing a word memory test, each additional gram per day of trans fat consumed was

14 associated with 0.76 fewer words correctly recalled. The authors suggest trans fat's well-established

15 pro-oxidant effect and its damage to cell energy processes is the pathway by which trans fat

16 consumption damages memory ability. The young men with the highest trans fat consumption scored

17 12 fewer recalled words on the 104-word test.[38]

18     **F.**    **The Artificial Trans Fat in Ginger Snaps Causes Organ Damage**

19     56.    Artificial trans fat molecules are readily incorporated into blood and organ cells in place

20 of natural fat molecules, which damages vital organs, including the heart, brain, and reproductive system.

21 Further, changing the chemical composition of cells induces systemic inflammation, where the immune

22 system fails to recognize such cells as native to the body and becomes persistently overactive, leading to

23

24 [35] Elizabeth E. Devore et al., *Dietary Fat Intake and Cognitive Decline in Women with Type 2 Diabetes*, 32 DIABETES CARE 635 (2009).

25 [36] *Id.*

26 [37] Golomb, B. et al., *Trans Fat Consumption is Adversely Linked to Memory in Working-Age Adults*, CIRCULATION. 130:A15572 (2014).

27 [38] *Id.*

28

1  further organ damage.[39]

2  **G.   Artificial Trans Fat Is Banned in Many American and European Jurisdictions**

3      57.   In 2008, California became the first state to ban all restaurant food with artificial trans fat.

4  Trans fats now may not be served in California's schools or restaurants in an amount greater than half a

5  gram per serving, nor contain any ingredient with more than this amount.[40]

6      58.   New York City banned trans fat in restaurants in 2006. Similar laws exist in Philadelphia;

7  Baltimore; Stamford, Connecticut; and Montgomery County, Maryland.

8      59.   A 2004 Danish law restricted all foods to fewer than 2 percent of calories from artificial

9  trans fat. Switzerland made the same restriction in 2008.[41]

10     60.   After conducting a surveillance study of Denmark's 2004 trans fat ban, researchers

11 concluded the change "did not appreciably affect the quality, cost or availability of food" and did not

12 have "any noticeable effect for the consumers."[42]

13     61.   Similar bans have been introduced in Austria and Hungary. Brazil, Argentina, Chile, and

14 South Africa have all taken steps to reduce or eliminate artificial trans fats from food.[43]

15     62.   In 2006, a trans fat task force co-chaired by Health Canada and the Heart and Stroke

16 Foundation of Canada recommended capping trans fat content at 2 percent of calories for tub margarines

17 and spreads and 5 percent for all other foods. On September 30, 2009, British Columbia became the first

18

19

20 [39] *See* Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction,* 135 J. NUTR. 562-66 (2005); *see also* Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets; a randomized crossover study,* 79 AM. J. CLIN. NUTR. 969-73 (2004); Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils,* 63 EURO. J. CLIN. NUTR. S22-33 (2009); Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure* 80 AM. J. CLIN. NUTR. 1521-25 (2004).

24 [40] Cal. Educ. Code § 49431.7; Cal. Health & Saf. Code § 114377.

25 [41] Andrew Collier, *Deadly Fats: Why Are We still Eating Them?*, The Independent (UK), June 10, 2008.

26 [42] Mozaffarian, 354 NEW ENG. J. MED. at 1610; *see also* Steen, Stender, *High Levels of Industrially Produced Trans Fat in Popular Fast Food,* 354 NEW ENG. J. MED. 1650, 1652 (2006).

27 [43] Coombes, *Trans fats: chasing a global ban,* 343 BRITISH MED. J. 5567 (2011).

28

1  province to impose these rules on all restaurants, schools, hospitals, and special events.[44]

2      63.    In its European Food and Nutrition Action Plan 2015-2020, the World Health

3  Organization identified one of its goals as "making the European Region trans fat-free."[45] The

4  European Commission is preparing legislation to ban the use of trans fats in 28 nations in the European

5  Union.[46]

6      64.    On June 17, 2015, the FDA released its Final Determination Regarding Partially

7  Hydrogenated Oils, in which it declared "PHOs are not GRAS [Generally Recognized as Safe] for any

8  use in human food."[47]

9      65.    The FDA will begin filing its own enforcement actions against companies that use PHOs

10  in 2018. However, as an unsafe food additive, PHO was never lawful to add to food in California during

11  the Class Period.

## V.    PLAINTIFF'S PURCHASES OF GINGER SNAPS

13      66.    Plaintiff Valorie Winn purchased Ginger Snaps during the Class Period defined herein.

14      67.    Ms. Winn purchased Ginger Snaps approximately 6-8 times annually for many years.

15      68.    The most frequent location of Ms. Winn's purchases of Ginger Snaps was the Pak 'N

16  Save located at 3889 San Pablo Ave., Emeryville, California 94608. Her most recent purchase was in

17  the middle of 2016.

18      69.    Plaintiff first discovered Mondelez's unlawful acts described herein in July 2016 when

19  she learned that Ginger Snaps had been unlawfully using an unsafe food additive for years and are

20  fraudulently marketed.

21      70.    Plaintiff, in the exercise of reasonable diligence, could not have discovered earlier

22  Mondelez's unlawful acts described herein because the dangers of artificial trans fats were known to

---

[44] *Province Restricts Trans Fat in B.C.*, British Columbia Ministry of Healthy Living and Sport Press Release (2009), *available at* http://www2.news.gov.bc.ca/news_releases_2005-2009/2009HLS0013-000315.htm (last visited January 30, 2017).

[45] Regional Committee for Europe, *European Food and Nutrition Action Plan 2015-2020*, 64th session.

[46] Basu, J. *European trans fat report 'could lead to ban,'* available at foodnavigator.com/Policy/Trans-fats-ban-in-Europe-possible-after-EU-debate (last visited January 24, 2017).

[47] FDA Final PHO Determination, 80 Fed. Reg. 34650, 34651 (June 17, 2015).

1    Defendant, but not to her, throughout the Class Period defined herein. Plaintiff is not a nutritionist, food

2    expert, or food scientist, but rather a lay consumer who did not have the specialized human nutrition

3    knowledge of Mondelez. Even today the nature and extensive utilization of artificial trans fats—

4    including that they necessarily exist where partially hydrogenated oil is used an ingredient in a food

5    product—is generally unknown to the average consumer. When purchasing Ginger Snaps during the

6    Class Period, Plaintiff read and relied on various health and wellness claims appearing on its packaging

7    (as further described herein), which individually and especially in the context of its packaging as a

8    whole, misleadingly implied that Ginger Snaps are healthy. Plaintiff would not have purchased Ginger

9    Snaps absent these advertisements.

10          71.     Because Plaintiff expected these statements to be true and honest, but they were not, she

11   did not receive the benefit of her purchases.

12          72.     Plaintiff intends to, and desires to, and will purchase Ginger Snaps when she is able to

13   do so with the assurance they will be free of misleading labeling claims.

### VI.    SPECIFIC MISREPRESENTATIONS, MATERIAL OMISSIONS, AND DECEPTIVE ACTS

16          73.     During the Class Period, Ginger Snaps were made with PHO yet contained deceptive

17   health and wellness claims.

18          74.     Exemplars of front and back label of Ginger Snaps are as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2009 Packaging with "Sensible Solutions" Claim**



**2012 Packaging without "Sensible Solutions" Claim**



14

1
2
3
4
5
6
7
8
9
10
11

**Current Packaging**



12  75.     Ginger Snaps contains the following health claims:

13  76.     **Misleading "Ginger" and "Molasses" Claims:** During the Class Period, Mondelez

14  marketed Ginger Snaps with the phrase, "Made with Real Ginger & Molasses!" The product's name

15  further implies that it is made with ginger. The implication of a reasonable consumer is that Ginger

16  Snaps are flavored and sweetened with natural substances, and are therefore healthy. This is not true.

17  Ginger Snaps contain more highly-refined, added sugar than molasses, and, during portions of the class

18  period, contained more added high fructose corn syrup ("HFCS") or refined sugar than molasses and

19  more PHO than ginger.

20  77.     Ginger is effective at alleviating the symptoms of gastrointestinal distress and possesses

21  numerous therapeutic properties, including antioxidant effects, the ability to inhibit the formation of

22  inflammatory compounds, and direct anti-inflammatory effects. It may also inhibit the growth of human

23  colorectal cancer cells, and induces cell death in ovarian cancer cells. Molasses contains more vitamins,

24  minerals, and trace elements (iron, potassium, calcium, and magnesium) than other sweeteners, like the

25  highly-refined sugar and HFCS in Ginger Snaps.

26  78.     By misleadingly labeling Ginger Snaps as "Made with Real Ginger & Molasses,"

27  Mondelez implies that Ginger Snaps provide the benefits of ginger and molasses, rather than the

28  detriments of high-processed, nutritionally empty sweeteners like added sugar, and other toxic

15

1    substances like PHO.[48]

2        79.    This language was part of an intentional campaign to deceptively market Ginger Snaps

3    as healthful.

4        80.    **Misleading "Sensible Solution" claim:** Mondelez marketed Ginger Snaps with the

5    phrase "Sensible Solutions" on the front of the product packaging. Further, the phrases "Low Saturated

6    Fat" and "No Cholesterol" appeared below the "Sensible Solutions" claim. These statements were

7    misleading because Ginger Snaps contained PHO, which damages heart health far more than dietary

8    saturated fat. The claim is likewise false because it is not "sensible" for a reasonable consumer to

9    purchase a cookie with ingredients that cause heart disease, cancer, cognitive decline, and damage to

10   vital organs.

11       81.    This language was part of an intentional campaign to deceptively market Ginger Snaps

12   as healthful.

### VII.    GINGER SNAPS UNNECESSARILY CONTAINED PHO AND ARTIFICIAL TRANS FAT

15       82.    Mondelez's use of PHO in Ginger Snaps was unnecessary. There are several safe

16   substitutes for PHO and artificial trans fat. Indeed, Mondelez uses "soybean and/or canola oil," neither

17   of which contain trans fat, as a substitute for PHO in the current formulation.

18       83.    Most manufacturers of competing cookie products have responsibly decided to refrain

19   from adding artificial trans fat to their products. Such brands sold in the United States include: Famous

20   Amos Chocolate Chip Cookies, Keebler Simple Sandies, Loaker Quadratini Hazelnut Wafer Cookies,

21   and Pepperidge Farm Milano Cookies.

22       84.    Although commercially viable alternative formulations and substitutes for PHO were

23   always available, Mondelez elected not to use them in Ginger Snaps in order to increase its profits at

24   the expense of consumers' health.

25

---

26   [48] While Ginger Snaps do not currently include PHO or HFCS as ingredients, they contained PHO as
27   recently as December 28, 2014. Mondelez replaced the HFCS in Ginger Snaps with added sugar. The
     added sugar currently used in Ginger Snaps has similar effects on the body as HFCS.
28

1  **VIII.    DEFENDANTS' PRACTICES ARE "UNFAIR" WITHIN THE MEANING OF THE**

2  **CALIFORNIA UNFAIR COMPETITION LAW**

3      85.    Mondelez's practices as described herein are "unfair" within the meaning of the

4  California Unfair Competition Law because its conduct is immoral, unethical, unscrupulous, and

5  substantially injurious to consumers, and the utility of this conduct to Mondelez does not outweigh the

6  gravity of the harm to Mondelez's victims.

7      86.    Plaintiff's claims for unfair business practices are independent of her claims for false

8  advertising. Even absent Ginger Snaps false advertising, the sale of Ginger Snaps violated the UCL and

9  implied warranty of merchantability.

10     87.    In particular, while Mondelez's use of PHO in Ginger Snaps may have had some utility

11  to Mondelez in that it allows it to realize higher profit margins than if it used safer PHO substitutes, this

12  utility is small and far outweighed by the gravity of the serious health harm Mondelez inflicts upon

13  consumers.

14     88.    Mondelez's conduct injured competing manufacturers of similar products that do not

15  engage in its unfair behavior, especially given its large market share and limited retail shelf space.

16     89.    Moreover, Mondelez's practices violated public policy as declared by specific

17  constitutional, statutory, or regulatory provisions, including the California Health & Safety Code §

18  114377 and California Education Code § 49431.7.

19     90.    Mondelez's actions also violated public policy by causing the United States and

20  California to pay—via Medicare, Medicaid, Affordable Care Act Exchange subsidies, veterans' health

21  programs, public employee and retiree health insurance—for treatment of trans fat-related illnesses.

22     91.    Further, the injury to consumers from Mondelez's practices is substantial, not

23  outweighed by benefits to consumers or competition, and not an injury consumers themselves could

24  reasonably have avoided.

25  **IX.    DEFENDANTS' PRACTICES ARE "UNLAWFUL" WITHIN THE MEANING**

26  **OF THE CALIFORNIA UNFAIR COMPETITION LAW**

27     92.    Mondelez's practices as described herein are "unlawful" within the meaning of the

28  California Unfair Competition Law because PHO is not Generally Recognized as Safe (GRAS).

17

1  Therefore, Mondelez's use of PHO rendered its products adulterated within the meaning of 21 U.S.C. §

2  342(a)(2)(C).

3  93.   The PHO used in Ginger Snaps appears nowhere on the FDA's list of the hundreds of

4  substances it considers GRAS.[49]

5  94.   PHO also fails to meet the fundamental requirement for GRAS status—that the

6  substance is safe. In fact, the FDA has explicitly recognized that there is no safe level of artificial trans

7  fat consumption.

8  95.   Under the Food Additives Amendment of 1958, which amended the FDCA, all food

9  additives are unsafe unless they (1) fall within a specified exemption to the statute's definition of food

10  additive, or (2) their use is pursuant to FDA approval. Because the PHO used in Ginger Snaps does not

11  meet either of these exceptions, they are, and long have been, unsafe, and unlawful for use in food.

12  96.   Mondelez's use of PHO in Ginger Snaps thus constituted adulteration under 21 U.S.C. §

13  342 and Cal. Health & Safety Code § 110545.

14  97.   On November 8, 2013, the FDA made its initial tentative determination that PHO is

15  unsafe, and therefore is not GRAS.[50]

16  98.   On June 17, 2015, after extensive public comment, the FDA determined trans fat is not

17  GRAS.[51]

18  99.   At no point during the class period was there a scientific consensus PHO was safe.

19  Indeed, for more than two decades, the scientific consensus has been that it is unsafe.

20  ## X.   RELIANCE AND INJURY

21  100.   When purchasing Ginger Snaps, Plaintiff was seeking products of particular qualities,

22  including products that did not negatively affect blood cholesterol levels or the health of her

23  cardiovascular system, and products made with safe, lawful ingredients.

24  101.   Plaintiff read and relied on, for her Ginger Snaps purchases, the Product's packaging and

[49] See 21 C.F.R. §§ 181, 182, 184 and 186.
[50] 78 Fed. Reg. 67169 (November 8, 2013).
[51] 80 Fed. Reg. 34650 (June 17, 2015).

18

1   the health and wellness message it conveyed, which was a substantial factor in each of her purchases.

2        102.   Specifically, Plaintiff relied on statements that Ginger Snaps were a "Sensible Solution"

3   and were "Made with Real Ginger & Molasses."

4        103.   Plaintiff was further injured by Mondelez's omission of information that would have

5   been important to her purchasing decisions.

6        104.   Plaintiff purchased Ginger Snaps believing they had the qualities she sought based on the

7   product's deceptive labeling and the natural assumption that food sold in stores by large companies

8   would not have unsafe and unlawful ingredients.

9        105.   Instead, they were actually unsatisfactory to her for the reasons described herein.

10       106.   Ginger Snaps costs more than similar products without false and misleading labeling, and

11   would have cost less, for example demanded less in the marketplace, absent Mondelez's false and

12   misleading statements and material omissions. Plaintiff lost money as a result of Mondelez's conduct

13   because she purchased products that were detrimental to her health and were unfairly offered for sale in

14   violation of federal and California law.

15       107.   Plaintiff purchased Ginger Snaps instead of competing products based on the false

16   statements and misrepresentations described herein.

17       108.   Plaintiff suffered physical injury when she repeatedly consumed Ginger Snaps because

18   consuming artificial trans fat in *any* quantity, including the quantity she actually consumed, inflames and

19   damages vital organs and substantially increases the risk of heart disease, diabetes, cancer, and death.

20       109.   Ginger Snaps contained an unsafe amount of artificial trans fat which rendered them unfit

21   for human consumption.

22               **XI.**    **DELAYED DISCOVERY**

23       110.   Plaintiff did not discover that Mondelez's behavior was unfair and unlawful and

24   Defendant's labeling was false, deceptive or misleading until July 2016, when she learned that Ginger

25   Snaps were fraudulently marketed and for years contained an unsafe food additive. Until this time, she

26   lacked the knowledge regarding the facts of her claims against Mondelez.

27       111.   Plaintiff is a reasonably diligent consumer who exercised reasonable diligence in her

28   purchase, use, and consumption of Ginger Snaps. Nevertheless, she would not have been able to

1  discover Mondelez's deceptive practices and lacked the means to discover them given that, like nearly

2  all consumers, she is not an expert on nutrition and does not typically read or have ready access to

3  scholarly journals such as The Journal of Nutrition,[52] The European Journal of Clinical Nutrition,[53] and

4  The New England Journal of Medicine,[54] where the scientific evidence of artificial trans fat's dangers

5  was published. Furthermore, Mondelez's labeling practices actively impeded Plaintiff's and Class

6  members' abilities to discover the dangerous effects of the Products throughout the Class Period.

7  ## XII.   CLASS ACTION ALLEGATIONS

8  112.   Plaintiff brings this action on behalf of herself and all others similarly situated (the

9  "Class"), excluding Defendants' officers, directors, and employees, and the Court, its officers and their

10  families.

11  113.   The Class is defined as follows:

12  **Misleading Claims Class (All Causes of Action)**

13  All persons who purchased in California, on or after February 11, 2006, for

14  household or personal use, Ginger Snaps products in packaging containing one or

15  more of the following phrases: "Made with Real Ginger & Molasses" and "Sensible

16  Solution."

17  **Adulteration Subclass (Causes of Action 1-3)**

18  All persons who purchased in the California, on or after February 11, 2006, for

19  household or personal use, Ginger Snaps products manufactured or distributed by

20  Mondelez, Inc. and containing partially hydrogenated oil.

21

22

23  [52] Peter M. Clifton et al., *Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With Myocardial Infarction*, 134 J. NUTR. 874, 874-79 (2004).

24  [53] A. Tavani et al., *Margarine Intake and Risk of Nonfatal Acute Myocardial Infarction in Italian*

25  *Women*, 51 EURO. J. CLIN. NUTR. 30–32 (1997) (estimating a 50 percent greater risk of heart attack in

26  women with high consumption of margarine, an association "independent of body mass index, history of hypertension and hyperlipidemia").

27  [54] Mozaffarian, 354 NEW ENG. J. MED. at 1611 ("10 to 19 percent of CHD events in the United States could be averted by reducing the intake of trans fat").

28

**Pak 'N Save Subclass (All Causes of Action)**

All persons who purchased in California, on or after April 1, 2013, for household or personal use, Ginger Snaps products in packaging containing one or more of the following phrases: "Made with Real Ginger & Molasses" and "Sensible Solution" from Pak 'N Save.

114.    Questions of law and fact common to Plaintiff and the Class include:

    a.    Whether Mondelez communicated a health and wellness message through Ginger Snaps packaging;

    b.    Whether that message was material, or likely to be material, to a reasonable consumer;

    c.    Whether that message was false, at variance with the truth, misleading, likely to deceive, and/or had the capacity to deceive the public and/or a reasonable consumer;

    d.    Whether Mondelez's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers;

    e.    Whether the slight utility Mondelez realizes as a result of its conduct outweighs the gravity of the harm the conduct causes to its victims;

    f.    Whether Mondelez's conduct violated public policy as declared by specific constitutional, statutory, or regulatory provisions;

    g.    Whether the injury to consumers from Defendants' practices is substantial;

    h.    Whether Mondelez fraudulently omitted material information in advertising Ginger Snaps as healthy;

    i.    Whether Pak 'N Save sold and distributed Ginger Snaps to the public in misleading packaging that was likely to deceive the public;

    j.    Whether the class is entitled to actual damages, restitution, rescission, punitive damages, attorneys' fees and costs, injunctive, and/or any other relief;

k.   Whether Pak 'N Save sold and distributed to the public a product with known health dangers, containing ingredients for which there are safer and commercially viable substitutes;

l.   Whether Pak 'N Save's conduct was knowing, or whether Pak 'N Save reasonably should have known of the conduct;

m.   Whether the statute of limitations should be tolled on behalf of the Class;

n.   Whether Mondelez's conduct constitutes violations of the California's False Advertising Law;

o.   Whether Pak 'N Save's conduct constitutes violations of the California's False Advertising Law;

p.   Whether Mondelez's conduct was immoral, unscrupulous, or offensive of public policy because Mondelez advertised Ginger Snaps to people deliberately seeking a healthy option despite knowing of the dangers from its artificial trans fat content;

q.   Whether Mondelez's conduct constitutes a violation of the California Consumer Legal Remedies Act;

r.   Whether Pak 'N Save's conduct constitutes a violation of the California Consumer Legal Remedies Act;

s.   Whether Mondelez's conduct constitutes a violation of the unlawful prong of California's Unfair Competition Law;

t.   Whether Pak 'N Save's conduct constitutes a violation of the unlawful prong of California's Unfair Competition Law;

u.   Whether Mondelez acted willfully, recklessly, negligently, or with gross negligence in violation of the law as alleged herein;

v.   Whether Pak 'N Save acted willfully, recklessly, negligently, or with gross negligence in violation of the law as alleged herein;

w.   Whether members of the Class are entitled to restitution and, if so, the correct measure of restitution;

22

x.    Whether members of the Class are entitled to an injunction and, if so, its terms; and

y.    Whether members of the Class are entitled to any further relief.

115.    By purchasing Ginger Snaps, all Class members were subjected to the same wrongful conduct.

116.    Absent Mondelez's material deceptions, misstatements, and omissions, and Pak 'N Save's unlawful sale, distribution, and marketing of Ginger Snaps Plaintiff and other Class members would not have purchased Ginger Snaps.

117.    Plaintiff's claims are typical of the Class' claims.

118.    All Class members were subjected to the same economic harm when they purchased Ginger Snaps and suffered economic injury.

119.    Plaintiff will fairly and adequately protect the interests of the Class, has no interests that are incompatible with the interests of the Class, and has retained counsel competent and experienced in class litigation.

120.    The Class is sufficiently numerous, as it includes thousands of individuals who purchased Ginger Snaps throughout California during the Class Period.

121.    Class representation is superior to other options for the resolution of the controversy. The relief sought for each Class member is small, as little as two dollars for some Class members. Absent the availability of class action procedures, it would be infeasible for Class members to redress the wrongs done to them.

122.    Mondelez has acted on grounds applicable to the Class, thereby making final injunctive relief or declaratory relief appropriate concerning the Class as a whole. Pak 'N Save has acted on grounds applicable to the Subclass, thereby making appropriate final injunctive relief or declaratory relief concerning the Subclass as a whole.

123.    Questions of law and fact common to the Class predominate over any questions affecting only individual members.

124.    Class treatment is appropriate under Fed. R. Civ. P. 23(a) and both Fed. R. Civ. P. 23(b)(2) and 23(b)(3). Plaintiff will, if notice is required, confer with Mondelez and seek to present the

23

1  Court with a stipulation and proposed order on the details of a class notice plan.

## XIII.   CAUSES OF ACTION

### First Cause of Action

### California Unfair Competition Law, Unfair Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

125.   In this and every cause of action, Plaintiff realleges and incorporates by reference each and every allegation contained elsewhere in this Complaint, as if fully set forth herein.

126.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

127.   The business practices and omissions of Mondelez as alleged herein constitute "unfair" business acts and practices in that Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers and the utility of its conduct does not outweigh the gravity of the harm to consumers.

128.   Further, Defendants' practices are unfair because they violated public policy as declared by specific constitutional, statutory, or regulatory provisions, including those embodied in the FDCA, California Health & Safety Code, and California Education Code.

129.   Moreover, Defendants' practices are unfair because the injury to consumers from Defendants' practices is substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided or should be obligated to avoid.

130.   In accordance with Cal. Bus. & Prof Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unfair acts and practices and to commence a corrective advertising campaign.

131.   Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendants from the sale of Ginger Snaps.

### Second Cause of Action

### California Unfair Competition Law, Unlawful Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

132.   Mondelez has made and distributed, in interstate commerce and in this County, products

24

that contained unlawful food additives. Ginger Snaps were placed into interstate commerce by Defendants and sold throughout the country and in this County.

133.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

134.   Defendants' conduct is "unlawful" because it violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, the Food Additives Amendment of 1958, which deems a food additive unsafe unless it has met one of two exceptions, neither of which the PHO used in the Ginger Snaps has met. 21 U.S.C. §§ 348, 342.

135.   Defendants' conduct also violated the following portions of the FDCA:

- 21 U.S.C. § 331(a), prohibiting the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded";

- 21 U.S.C. § 331(b), prohibiting the "adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce";

- 21 U.S.C. § 331(c), prohibiting the "receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise";

- 21 U.S.C. § 331(k), prohibiting "the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded";

- 21 U.S.C. § 342(a), which deems any food adulterated if it "contains any poisonous or deleterious substance which may render it injurious to health";

- 21 U.S.C. § 348, prohibiting the use of any food additive unless it has been deemed GRAS;

136.   Defendants' conduct violates The California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110100, which adopts all FDA regulations as state regulations. Defendants' conduct violates the following sections of the Sherman Law:

25

• § 110085, adopting all FDA food additive regulations as state regulations;

• § 110100, adopting all FDA regulations as state regulations;

• § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

• § 110620, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is adulterated.";

137.    The use of artificial trans fat in Ginger Snaps constitutes a violation of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

138.    Defendants' unlawful acts allowed them to sell more units of Ginger Snaps than they would have otherwise, and at a higher price, and higher margin.

139.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices and to commence a corrective advertising campaign. Plaintiff intends to purchase the Ginger Snaps in the future when Defendants ceases their unfair business practices.

140.    Plaintiff also seeks an order for the disgorgement and restitution of all revenue received by Defendants from the sale of Ginger Snaps.

### Third Cause of Action

### Breach of Implied Warranty of Merchantability

141.    Defendants, through their acts and omissions set forth herein, in the sale, marketing, and promotion of Ginger Snaps, made representations to Plaintiff and the Class that Ginger Snaps were safe to consume.

142.    Plaintiff and the Class bought the Products manufactured, advertised, and sold by Defendants, as described herein.

143.    Defendants are merchants with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was in the sale to Plaintiff and other members of the Class an implied warranty that those goods were merchantable.

144.   Defendants breached that implied warranty, however, in that the Products were not fit for their ordinary purpose and do not conform with the representations on their labels, as set forth in detail herein.

145.   As an actual and proximate result of Defendants' conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendants to be merchantable in that they did not conform to the promises and affirmations made on the container or label of the goods.

146.   Plaintiff and Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of Ginger Snaps' purchase price.

<h3 align="center">Fourth Cause of Action</h3>

<h3 align="center">California Unfair Competition Law, Unlawful Prong</h3>

<h3 align="center">Cal. Bus. & Prof. Code §§ 17200 <em>et seq.</em></h3>

147.   Defendants have made and distributed, in interstate commerce and in this County, products that make false and misleading statements of fact regarding their content. Ginger Snaps were placed into interstate commerce by Defendants and sold throughout California.

148.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

149.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "unlawful" business acts and practices in that Defendants' conduct violates the California False Advertising Law, and the California Consumer Legal Remedies Act, as alleged herein.

150.   Defendants' conduct is further "unlawful" because it violates § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), in that Defendants' advertising constitutes false statements of fact in interstate commerce about its own and other products, which were material in that they were likely to influence consumers' purchasing decisions, and which had a tendency to deceive, or actually deceived a substantial segment of Defendants' audience, resulting in injury.

151.   Defendants' conduct is further "unlawful" because it violates the Federal Food, Drug, and Cosmetic Act ("FDCA"), specifically, (1) 21 U.S.C. § 343(a), which deems food misbranded when the label contains a statement that is "false or misleading in any particular," (2) 21 C.F.R. § 101.13(i)(3), which bars nutrient content claims that are "false or misleading in any respect," (3) 21

27

C.F.R. § 101.14 requiring claims to be "complete, truthful, and not misleading," and which "enables to public to comprehend the information" and (4) 21 U.S.C. § 343(r)(3)(C) requiring claims to present "a balanced representation of the scientific literature relating to the relationship between a nutrient and a disease or health-related condition to which the claim refers," be "stated in a manner so that the claim is an accurate representation of the authoritative statement," be in compliance with "section 201(n)", and the product "not [to] contain . . . any nutrient in an amount which increases to persons in the general population the risk of a disease or health-related condition which is diet-related."

152.    Defendants further violate the FDCA's implementing regulation, 21 C.F.R. § 1.21, because Ginger Snaps packaging fails to reveal material facts, namely the dangers of PHO described in detail herein, "in light of other representations," namely the specific statements described herein as misleading. In particular, its comparison of Ginger Snaps and butter omitted the material fact that butter is free of PHO, while Ginger Snaps contains it in dangerous amounts.

153.    Defendants' conduct further violates the California Sherman Food, Drug, and Cosmetic Law ("Sherman Law"), Cal. Health & Safety Code § 110660, which deems food products "misbranded" if their labeling is "false or misleading in any particular." Defendants' conduct also violates the following sections of the Sherman Law:

- § 110100, adopting all FDA regulations as state regulations;

- § 110290, "In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these shall be taken into account. The extent that the labeling or advertising fails to reveal facts concerning the food . . . or consequences of customary use of the food . . . shall also be considered.";

- § 110390, "It is unlawful for any person to disseminate any false advertisement of any food . . . . An advertisement is false if it is false or misleading in any particular.";

- § 110395, "It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.";

- § 110398, "It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.";

- § 110400, "It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . .";
- § 110670, "Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.";
- § 110680, "Any food is misbranded if its labeling or packaging does not conform to the requirements of Chapter 4 (commencing with Section 110290).";
- § 110705, "Any food is misbranded if any word, statement, or other information required pursuant to this part to appear on the label or labeling is not prominently placed upon the label or labeling and in terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.";
- § 110760 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded.");
- § 110765, "It is unlawful for any person to misbrand any food."; and
- § 110770, "It is unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food."

154. All of the challenged labeling statements made by Mondelez thus constitute violations of the FDCA and the Sherman Law and, as such, violated the "unlawful" prong of the UCL.

155. Mondelez leveraged its deception to induce Plaintiff and members of the Class to purchase products that were of lesser value and quality than advertised.

156. Plaintiff suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: she was denied the benefit of the bargain when she decided to purchase Ginger Snaps over competing products that are less expensive and/or contain no artificial trans fat.

157. Had Plaintiff been aware of Defendants' false and misleading advertising tactics, she would not have purchased Ginger Snaps.

158. Defendants' deceptive advertising allowed it to sell more units of Ginger Snaps than it would have otherwise, and at a higher price.

CLASS ACTION COMPLAINT

159.   In accordance with Cal. Bus. & Prof Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; to commence a corrective advertising campaign; and restitution of all monies from the sale of Ginger Snaps.

160.   Plaintiff also seeks an order for the disgorgement and restitution of all monies from the sale of Ginger Snaps, which were acquired through acts of unfair competition.

## Fifth Cause of Action

### California Unfair Competition Law, Fraudulent Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

161.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

162.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute "fraudulent" business acts and practices in that Defendants' conduct has a likelihood, capacity or tendency to deceive Plaintiff, the Classes, and the general public.

163.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

164.   Plaintiff further seeks an order for the restitution of all monies from the sale of Ginger Snaps which were acquired through acts of unlawful, unfair, and/or fraudulent competition.

## Sixth Cause of Action

### California Unfair Competition Law, Unfair Prong

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

165.   Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

166.   Plaintiff suffered injury in fact and lost money or property as a result of Defendants' deceptive advertising: she was denied the benefit of the bargain when she decided to purchase Ginger Snaps over competing products, which are less expensive and/or contain no artificial trans fat.

167.   Had Plaintiff been aware of Defendants' false and misleading advertising tactics, she would not have purchased Ginger Snaps.

168.   Defendants' deceptive advertising allowed them to sell more units of Ginger Snaps, and at a higher price.

169.   The acts, omissions, misrepresentations, practices, and non-disclosures of Mondelez as alleged herein constitute "unfair" business acts and practices because Defendants' conduct is:

      a.     immoral, unethical, unscrupulous, and offends public policy;

      b.     the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct; and

      c.     the injury to consumers caused by Defendants' conduct is substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided.

170.   In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices; to commence a corrective advertising campaign; and restitution of all monies from the sale of Ginger Snaps.

## Seventh Cause of Action

### California False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500 *et seq.*

171.   In violation of Cal. Bus. & Prof. Code §§ 17500 *et seq.*, the advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and use of Ginger Snaps without the knowledge that they contained toxic artificial trans fat.

172.   Defendants knew and reasonably should have known that the labels on Ginger Snaps were untrue and misleading.

173.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

### Eighth Cause of Action

### California Consumer Legal Remedies Act

### Cal. Civ. Code §§ 1750 *et seq.*

174. The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

175. Defendants' policies, acts and practices were designed to, and did, result in the purchase and use of Ginger Snaps primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

    a. § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

    b. § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

    c. § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

    d. § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

176. As a result, Plaintiff and the Class have suffered irreparable harm and are entitled to injunctive relief and restitution.

177. As a further result, Plaintiff and the Class have suffered damages, and because the conduct was deliberate, immoral, oppressive, made with malice and/or contrary to public policy, they are entitled to punitive or exemplary damages.

178. In compliance with Civ. Code § 1782, Plaintiff sent Mondelez written notice of her claims on September 7, 2016 and sent Pak 'N Save written notice of her claims on February 1, 2017. Pursuant to section 1782 *et seq.* of the CLRA, Plaintiff notified Defendants in writing by certified mail of the particular violations of § 1770 of the Act as to Ginger Snaps and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act. Defendants' wrongful business practices regarding Ginger Snaps constituted, and constitute, a continuing course of conduct in violation of the CLRA since Defendants are still

1   representing that Ginger Snaps have characteristics, uses, benefits, and abilities which are false and
2   misleading, and have injured Plaintiff and the Class.

3        179.    Mondelez received Plaintiff's written notice on September 12, 2016. Pak 'N Save
4   received Plaintiff's written notice on February 3, 2017.

**Ninth Cause of Action**

**Breach of Express Warranty**

7        180.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set
8   forth in full herein.

9        181.    During the class period, Defendants made written representations to the public,
10  including Plaintiff, by its advertising and packaging that Ginger Snaps are "Made with Real Ginger &
11  Molasses" and are a "Sensible Solution."

12       182.    These promises printed on the label became part of the basis of the bargain between the
13  parties and thus constituted an express warranty.

14       183.    Thereon, Defendants sold the goods to Plaintiff and other consumers who bought the
15  goods from Defendants.

16       184.    However, Defendants breached this express warranty in that Ginger Snaps hardly
17  contain any ginger or molasses and in that they are not a "Sensible Solution."

18       185.    As a result of this breach, Plaintiff and other consumers in fact did not receive goods as
19  warranted by Defendants.

20       186.    As a proximate result of this breach of warranty by Defendants, Plaintiff and other
21  consumers have been damaged in an amount to be determined at trial.

**XIV.    PRAYER FOR RELIEF**

23       WHEREFORE, Plaintiff, on behalf of herself, all others similarly situated, and the general
24  public, prays for judgment against Defendants as follows:

25       A.    An order confirming that this class action is properly maintainable as a class action as
26           defined above, appointing Plaintiff Valorie Winn and her undersigned counsel to
27           represent the classes defined herein, and requiring Defendants to disseminate and bear
28           the cost of class notice;

33

B.     An order requiring Defendants to pay restitution and damages to Plaintiff and class members in the amount of less than $5 million;

C.     An order requiring Defendants to disgorge any benefits received from Plaintiff and their unjust enrichment realized as a result of their improper and misleading advertising, marketing, sale, and distribution of Ginger Snaps;

D.     An Order declaring the conduct complained of herein violates the Unfair Competition Law;

E.     An Order requiring Defendants to pay restitution and damages to Plaintiff and members of the Misleading Claims Subclass so that they may be restored any money which was acquired by means of any deceptive and fraudulent acts;

F.     An award of punitive damages to the extent allowable by law in an amount to be proved at trial;

G.     An order requiring Defendants to cease and desist their deceptive, unconscionable and fraudulent practices;

H.     An order requiring Mondelez to engage in a corrective advertising campaign;

I.     An order requiring Pak 'N Save to cooperate in the corrective advertising campaign, including placing stores displays correcting Mondelez's misleading claims adjacent to the Ginger Snaps shelf;

J.     An award of prejudgment and post judgment interest;

K.     An award of attorneys' fees and costs; and

L.     Such other and further relief as this Court may deem just, equitable or proper.

## XV.    JURY DEMAND

Plaintiff requests a trial by jury.

## XVI.    DISCLAIMER OF FEDERAL JURISDICTION

Plaintiff expressly disclaims all relief that would subject this action to jurisdiction under the Class Action Fairness Act, including, but not limited to, relief of $5 million or more.

34

DATED: March 24, 2017

Respectfully Submitted,

THE WESTON FIRM
GREGORY S. WESTON
ANDREW C. HAMILTON
1405 Morena Blvd., Suite 201
San Diego, CA 92110
Telephone:    (619) 798-2006
Facsimile:     (313) 293-7071

*Counsel for Plaintiff*

35

CLASS ACTION COMPLAINT